# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| THE CATHOLIC BENEFITS ASSOCIATION LCA, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case Nos. CIV-14-240-R CIV-14-685-R |
| ALEX M. AZAR II, in his official capacity as Acting Secretary, Department of Health and Human Services, *et al.*, | ) ) ) ) | |
| Defendants. | ) | |

## ORDER

"A request for attorney's fees should not result in a second major litigation," yet here we are with Plaintiffs' counsel Martin Nussbaum's ("Counsel") Motion for Attorneys' Fees and Non-Taxable Costs Under 42 U.S.C. § 1988. *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983); *CBA I* (CIV-14-240-R) Docs. 187, 188; *CBA II* (CIV-14-685-R) Docs. 82, 83.[1] Plaintiffs—the "prevailing party" entitled to a "reasonable" attorneys' fee under Section 1988—are Catholic employers that obtained a declaratory judgment and permanent injunction under the Religious Freedom and Restoration Act ("RFRA") to enjoin the Defendant U.S. Departments of Health and Human Services, Treasury, and Labor, and their respective Secretaries ("the Government"), from enforcing the Affordable Care Act's contraceptive mandate. Doc. 184. In a case that involved no discovery, summary judgment briefing, trial, or merits briefing on appeal, Counsel's request of $3,103,966 in attorneys' fees

---

[1] The Court treats *CBA I* (CIV-14-240-R) and *CBA II* (CIV-14-685-R) as one case for purposes of this attorneys' fees motion. Docket numbers refer to *CBA I* unless otherwise noted.

for 6,098.8 hours and of $38,149.74 in costs is *not* "reasonable." 42 U.S.C. § 1988. It is, quite frankly, indefensible.

After a thorough review of the litigation history, attorneys' fees briefs, and billing records, the Court hereby awards Plaintiffs $699,725.95 in fees for 3,451.45 hours reasonably expended litigating this case and $18,881.41 in expenses not recoverable under 28 U.S.C. § 1920. The Court begins with a litigation recap before scrutinizing Counsel's billing records to limit fees to hours "reasonably expended *on the litigation*." *Webb v. Bd. of Educ. of Dyer County,* 471 U.S. 234, 242 (1985) (quoting *Hensley*, 461 U.S. at 433). That time multiplied by a reasonable hourly rate yields the lodestar amount, $1,272,229, which the Court adjusts downward after considering the *Johnson* factors. Finally, the Court concludes by deducting costs that lack substantiation, are tied to non-compensable matters, or should be absorbed as part of law firm overhead.

## I. Background

This case—like the dozens filed before it nationwide by employers with religious objections to providing certain health insurance benefits—concerns the Government's promulgation of Affordable Care Act rules known as the "contraceptive mandate." The mandate required employers to "provide, pay for, or otherwise" facilitate access to "contraception, abortion-inducing drugs or devices, sterilization, and related counseling" ("CASC benefits") through employee health insurance. Complaint, Doc. 1, at 4–5. Plaintiffs are "Catholic organizations and, as part of their religious witness and exercise, are committed to providing no healthcare benefits to their employees inconsistent with Catholic teaching." Catholic teaching prohibits CASC benefits because they involve "artificial interference with

the creation and nurture of new life." *Id.* at 4.

## A. *CBA I* and *CBA II*

Plaintiffs filed a ninety-four page complaint comprising ten claims under RFRA, the First Amendment, and the Administrative Procedure Act, as well as a motion for a preliminary injunction, in March 2014. Docs. 1, 4, 5. Because the case dealt primarily with issues of law, the parties agreed to suspend discovery and responsive pleadings until the Court ruled on the preliminary injunction and the parties exhausted their inevitable appeals. Docs. 47, 49. The Court considered the briefing, supplemental authority provided by both parties, an amicus brief filed by the ACLU of Oklahoma, and the parties' arguments at a hearing, and granted a preliminary injunction on June 4, 2014; it enjoined the contraceptive mandate and associated financial penalties against then-current members of the Catholic Benefits Association ("CBA"). Doc. 68. The Government appealed the injunction to the Tenth Circuit U.S. Court of Appeals, and Plaintiffs cross-appealed. Docs. 74, 77. Plaintiffs also moved for class certification, but the Court agreed with the Government that judicial economy would be best served by staying consideration of that motion pending exhaustion of appeals. Docs. 53, 88.

When the Court declined to expand the preliminary injunction to protect new CBA members, Plaintiffs filed a new lawsuit in July 2014, *CBA II* (CIV-14-685-R). *See* Docs, 68, 73. Soon thereafter the Court granted a temporary restraining order ("TRO") in *CBA II*. *CBA II* Doc. 12. The Court granted Plaintiffs' motion to convert the *CBA II* TRO to a preliminary injunction in December 2014. *CBA II* Doc. 40.

This began a series of appeals and motions to amend the preliminary injunctions in

both cases, all as the Government modified rules governing the contraceptive mandate. *See* Doc. 188-1, at 12–13, 52–54; Doc. 190, at 19. The Court granted Plaintiffs a streamlined method to expand injunctive relief to new CBA members every three months, which the Government opposed and appealed nearly every time. Doc. 107; *see* Docs. 118, 129, 140. The Tenth Circuit held both *CBA* cases' appeals in abeyance, first pending resolution of three other Tenth Circuit cases on substantially similar issues and then at least until the Supreme Court ruled on the Tenth Circuit's *Little Sisters* decision. *Little Sisters of the Poor Home for the Aged, Denver, Colo. v. Burwell*, 794 F.3d 1151 (10th Cir. 2015); Docs. 82, 123.

The Supreme Court vacated and remanded the seven consolidated contraceptive-mandate cases in 2016 to allow "an opportunity to arrive at an approach going forward that accommodates petitioners' religious exercise while at the same time ensuring that women covered by petitioners' health plans receive full and equal health coverage, including contraceptive coverage." *Zubik v. Burwell*, 136 S. Ct. 1557, 1560 (2016) (internal quotations omitted). Next the Government sought public comment on changes to the mandate's accommodation process, but ultimately decided against changes. Doc. 188-1, at 55.

A new presidential administration in 2017 brought a complete shift in the Government's position on the mandate. President Trump issued an executive order urging greater accommodations for religious employers, the Government issued new interim final rules effectively ending the mandate, and the Government dropped all of its appeals in *CBA I* and *CBA II*. Doc. 188-1, at 56; Docs. 151, 153, 155, 157, 159; *CBA II* Doc. 55. Plaintiffs then filed a motion for a permanent injunction and declaratory judgment to protect themselves from any future regulatory changes or financial penalties related to CASC benefits. Doc. 57.

While the Government conceded that the mandate violated RFRA, it took no position on whether permanent relief was warranted given the apparent mootness of the issue. Doc. 167. But other districts enjoined Defendants from enforcing the new interim final rules, prompting the Government to abandon its mootness argument. Doc. 174. Thus, on March 7, 2018, nearly four years after this case started, the Court entered a permanent injunction and declaratory judgment protecting Plaintiffs under RFRA. Doc. 184; *see also CBA II* Doc. 79.

## B. Attorneys' Fees Litigation

The parties have extensively litigated attorneys' fees and costs for this case largely due to Counsel's attempts to conceal the unreasonableness of his fees request. These tactics are best described in three stages—(1) Take our word for it; (2) Litigation, *et cetera*; and (3) Doubling (and tripling) down.

### 1. Take our word for it

In the Motion for Attorneys' Fees, Counsel first requested—without a shred of documentation—$3,334,696.50 in attorneys' fees for nineteen attorneys' 6,538.15 work hours and $39,188.06 in expenses. Doc. 188.[2] The motion offered only Lewis Roca Rothgerber Christie LLP ("LRRC") attorneys' purported billing rates and total hours without "meticulous, contemporaneous time records." *Ramos v. Lamm*, 713 F.2d 546, 553 (10th Cir. 1983), *disapproved of on other grounds by Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 483 U.S. 711 (1987); *see* Doc. 188-1, at 48. Of note, Counsel also represented that—unlike in many civil rights cases where clients are not billed during the

---

[2] Counsel ignored LCvR7.1's page limits by styling his attorneys' fees arguments as "declarations" appended as exhibits, rather than seeking leave of court to file oversized briefs. *See* Docs. 188, 200.

litigation and the Court must "simulate the market" for services—"the Court need not speculate as to what hours would reasonably have been billed to a client, because LRRC *did* bill the Catholic Benefits Association for the hours reported in Martin Nussbaum's declaration." Nussbaum Declaration, Doc. 188, at 6 (quoting *Robinson v. City of Edmond*, 160 F.3d 1275, 1281 (10th Cir. 1998)). By not including contemporaneous billing records, Counsel implied that his proposed billing rates and hours were an accurate reflection of what Plaintiffs paid in attorneys' fees—"Take our word for it. This is what our services were worth."

The Government strongly objected to this "outrageously excessive" request, and the Court instructed Counsel to file a supplemental brief with billing records. Doc. 190; *see* Doc. 191, 202. In that supplemental brief, attaching over 800 pages of billing invoices, Counsel decreased his requested fees to $3,064,474.50 for fifteen attorneys' 6,001.3 hours and increased his requested costs to $39,302.98. Doc. 193. These invoices revealed that the hourly rates from Counsel's opening brief were nearly thirty-five percent higher than those billed to the clients.[3] In other words, Counsel actually simulated a market for services much more beneficial to him and his LRCC team and relied on the absence of billing records to mask this markup.

### 2. Litigation, *et cetera*

The invoices also showed Counsel's efforts to recover fees for time far beyond litigating this case. *See* Defendant's Supplemental Brief, Doc. 197, at 9–16. In particular, the

---

[3] LCCR billed Plaintiffs $2,483,742.50, but requested $3,334,969.50 in his opening brief. *See* Ex. 1 – Adjusted Fees (total "Billed Amount") & n.2; Doc. 188, at 1.

invoices are separated into four categories: (1) "Litigation," (2) "Corporate," (3) "Member services," and (4) "Morally compliant insurance." Docs. 193-1 through 193-8. "Litigation" includes not only tasks like drafting motions and researching in this case, but also LRRC's "staffing a moot court before the Tenth Circuit argument" in *Little Sisters*—to which Plaintiffs were not a party—"and provid[ing] amicus advocacy at the Supreme Court" in *Zubik*. Doc. 188-1, at 19; *see, e.g.*, Doc. 193-3, at 59–60, 74–76; Doc. 193-4, at 89; Doc. 193-5, at 3. "Corporate" includes tasks like "[d]raft[ing] articles of organization and bylaws," assembling a board of directors, and conducting webinars for members on mandate-related issues. *See, e.g.*, Doc. 193-1, at 19, 29, 46. "Member services" appears to overlap with "Corporate," at least with respect to member webinars, but the category also consists of LRCC's member recruitment for the CBA and correspondence and advice on various issues. *See, e.g.*, Doc. 193-3, at 32–33, 49–50. Lastly, "Morally compliant insurance" services predate the filing of this case and include regulatory advice for "a Catholic employer that became the CBA's first member." Doc. 200, at 11; *see, e.g.*, Doc. 193-1, at 1, 3, 6, 9.

### 3. Doubling (and tripling) down

In light of the broad scope of matters billed and the apparent excessiveness of Counsel's request, the Court ordered that Counsel (1) file a second supplemental brief to address these concerns and (2) reformat the billing invoices into a clearer format to enable the Court's reasonableness inquiry.[4] Doc. 196. Counsel violated this order by filing two briefs with fourteen exhibits, only two of which the Court actually requested, a simplified fees

---

[4] "[T]he district court may quite properly impose on the claimant the burden of organizing or summarizing the billing records in such a manner as to facilitate judicial review of the reasonableness of the claim for attorneys' fees." *Robinson v. City of Edmond*, 160 F.3d 1275, 1285 & n.11 (10th Cir. 1998).

spreadsheet and a costs spreadsheet. Docs. 200, 201. Counsel removed some billing entries but increased his overall requested fees—largely due to $210,875, or 441 hours, sought on attorneys' fees litigation alone—to $3,103,966 for 6,098.80 hours, and he decreased his costs request to $38,149.74. Docs. 201-1, 201-2.

Counsel's second supplemental brief repeated many of the arguments in the opening brief, but was more important for what it did not do—concede that most of his categories for LRRC work have little to do with this litigation. Doc. 200. The moot court and amicus work, Counsel argues, were compensable efforts to secure binding precedent on this Court. *Id.* at 13–15. He characterizes the "Corporate" category as necessary to build "a Catholic ministry capable of invoking associational standing so it could bring this case for all its members." *Id.* at 11. The "Member Services" category is recruitment time spent "communicati[ng] with prospective [CBA] members." *Id.* at 12. Counsel justifies billing "Morally Compliant Insurance" work—some of which predated the filing of this case by nearly a year and a half— as "time necessary to determine who should be the appropriate plaintiffs or whether the suit may even be brought." *Id.* at 11 (quoting *Case v. Unified Sch. Dist. No. 233, Johnson Cnty., Kan.*, 157 F.3d 1243, 1251 (10th Cir. 1998)). And media-related matters, which appear in nearly every category, are framed as necessary "to publicize [the] litigation to potential class members." *Id.* at 12 (internal quotation omitted).

Counsel's third supplemental brief, filed without leave of Court, finally provided the simplified billing records the Court asked for in Excel format, but also included nine exhibits intended to show how the Government's supplemental-brief exhibits are misleading. Doc. 201 (citing Doc. 197); *see* CBA's Submitted Fees, Doc. 201-1; CBA's Submitted Costs, Doc.

201-2. Apparently the Government, by employing "a key word search without much selectivity," exaggerated Counsel's billing excess and double-counted various time entries. Doc. 201, at 7.

Despite serious concerns raised by the Government, in none of these supplemental briefs did Counsel (1) cut much of the excess; (2) separate out the block-billed entries that cover multiple categories, which made detailed review nearly impossible; or (3) explain why he categorized similar tasks, like webinars, differently throughout the billing records. Instead, Counsel insisted on doubling (and tripling) down on excessive billing and inclusion of matters way beyond the scope of this litigation.

## II. Discussion

The Court faces one question, what is a "reasonable" attorneys' fees award "sufficient to induce a capable attorney to undertake the representation of a meritorious civil rights case"? 42 U.S.C. § 1988; *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 552 (2010). The answer starts with the "guiding light of our fee-shifting jurisprudence," the "lodestar amount"—"the product of reasonable hours times a reasonable rate." *Perdue*, 559 U.S. at 551 (quoting *Gisbrecht v. Barnhart*, 535 U.S. 789, 801 (2002)); *Cooper v. State of Utah*, 894 F.2d 1169, 1171 (10th Cir. 1990). "It [is] counsel's burden to prove and establish the reasonableness of each dollar, each hour, above zero." *Mares v. Credit Bureau of Raton*, 801 F.2d 1197, 1210 (10th Cir. 1986). "Where the documentation of hours is inadequate, the district court may reduce the award accordingly." *Hensley*, 461 U.S. at 433. But once Counsel has met this burden to show reasonable hours and rates, "the resulting product is presumed to be a reasonable fee as contemplated by Section 1988." *Robinson*, 160 F.3d at 1280–81 (quoting

*Cooper*, 894 F.2d at 1171).

Nonetheless, after calculating the lodestar, "other considerations . . . may lead the district court to adjust the fee upward or downward," including the "factors identified in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–719 (CA5 1974)." *Hensley*, 461 U.S. at 434 & n.9. "[M]any of these factors usually are subsumed within the initial calculation of hours reasonably expended at a reasonable hourly rate." *Id.*

Due to the nearly 3,000 rows of time entries in this case, it is "practically impossible" for the Court to "identify and justify each disallowed hour." *Case*, 157 F.3d at 1250 (quoting *Mares*, 801 F.2d at 1202). However, by attaching detailed, color-coded spreadsheet exhibits to illustrate the reductions applied, the Court herein outlines which hours and costs are compensable and employs "general reduction[s] of hours claimed" where necessary. *Mares*, 801 F.2d at 1203; *see* Ex. 1 – Adjusted Fees; Ex. 3 – Adjusted Costs.[5] Wholesale deletions of time entries are indicated in red; twenty-percent cuts are yellow; fifty-percent cuts are orange; seventy percent cuts are green; and eighty percent cuts are blue. *Id.*

## A. Lodestar

### 1. The hours expended

There are several tasks and types of matters that Counsel has failed to show are reasonably compensable under Section 1988. Counsel "should exercise 'billing judgment' with respect to hours worked," making a "good-faith effort to exclude from a fee request

---

[5] Ex. 1 – Adjusted Fees is copied directly from the Excel version of Counsel's "Exhibit 1: CBA's Submitted Fees" (Doc. 201-1), after which the Court changed two of the column headings and added columns and highlights to show deductions. *See* Ex. 1 – Adjusted Fees nn. 1 & 3. The Court did the same with Counsel's "Exhibit 2: CBA's Submitted Costs" (Doc. 201-2) to produce Ex. 3 – Adjusted Costs.

hours that are excessive, redundant, or otherwise unnecessary." *Hensley*, 461 U.S. at 434, 437. Accordingly, the Court looks to those hours "'necessary' under the circumstances" and "approach[es] this reasonableness inquiry 'much as a senior partner in a private law firm would review the reports of subordinate attorneys when billing clients. . . .'" *Robinson*, 160 F.3d at 1281 (quoting *Ramos,* 713 F.2d at 555).

### a) Pre-filing

Many of the pre-filing hours were not reasonably expended on this case. Counsel's first billing entries date back to December 2012, over fifteen months before Plaintiffs filed their *CBA I* complaint. "In some instances, such as when the litigation involves particularly difficult questions of standing, . . . attorneys may be awarded time necessary to determine who should be the appropriate plaintiffs or whether the suit may even be brought." *Case*, 157 F.3d at 1251. Counsel is correct that in a case like this—Plaintiff CBA represents hundreds of Catholic employers, albeit the case was never certified a class action—pre-filing compensation is appropriate. But the billing records' first mention of standing does not appear until September 1, 2013, just over six months pre-filing. *See* Ex. 1 – Adjusted Fees.

Further, there is no indication that any of the "Morally Compliant Insurance" work that Counsel performed for "a Catholic employer that became the CBA's first member" even remotely resembles the sort of compensable "pre-recruitment" time approved of by the Tenth Circuit. Doc. 200, at 11; *Case*, 157 F.3d at 1251 (citing *Dowdell v. City of Apopka, Fla.*, 698 F.2d 1181, 1188 (11th Cir. 1983)). It is telling that once Counsel removed the "Morally Compliant Insurance" category—time that was exclusively billed pre-filing—and moved

those matters into the "Litigation" category, he renamed the category "Litigation: *General*."[6] *Compare* Billing Invoice, Doc. 193-1, at 25, *with* CBA's Submitted Fees, Doc. 201-1. Inserting the qualifier "General" appears to be Counsel's way of acknowledging that many of the matters billed in this category may be litigation-related, but they were "unnecessary" to this litigation. *Hensley*, 461 U.S. at 434. Because Counsel has not met his burden to show that most of these pre-filing time entries are compensable, the Court bars recovery of any hours billed before September 1, 2013, when it appears that Counsel began working on this litigation.

The Court also finds unreasonable Counsel's effort to bill for attorney Brent R. Owen's 10.6 pre-filing hours preparing a memorandum on "wrongful life claims." *See* Ex. 1 – Adjusted Fees (12/17/2013–12/18/2013, Brent R. Owen). Counsel has not shown the relevance of wrongful life claims to this litigation on the contraceptive mandate, nor does the phrase "wrongful life" even appear once in the dockets for *CBA I* or *CBA II*.

### b) Moot court and amicus

Counsel's entire "Litigation: Other (inc. moot and amicus)" category is non-compensable because it was not "'necessary' under the circumstances" to *this* litigation. *Robinson*, 160 F.3d at 1281. LRRC coordinated a moot court in Denver for the parties in *Little Sisters* before the Tenth Circuit and then filed Supreme Court amicus briefs at the certiorari and merits stage in the consolidated *Zubik* contraceptive-mandate cases.[7] Counsel

---

[6] Naming the category "Litigation: General" violates the Court's order regarding simplified billing records, which requested a simple "Yes" or "No" column next to the "Litigation" column to advise "if the work was expended on this case" or another one. Doc. 196, at 1.

[7] *See* Brief of The Catholic Benefits Association and The Catholic Insurance Company, as *amici curiae* in support of Petitioners, *Little Sisters of the Poor v. Burwell*, No. 15-105 (Aug. 24, 2015), available at http://www.scotusblog.com/wp-content/uploads/2015/08/LSP-Amicus-Final.pdf; Brief of The Catholic

argues this is compensable work "*on the litigation*" because it was necessary to create binding precedent in this case. Doc. 200, at 13–14. It was reasonable for Plaintiffs to monitor other contraceptive-mandate cases and file status reports in the Tenth Circuit, but Counsel has only presented evidence to show that LRRC's moot and amicus work were, at best, helpful to achieving a favorable outcome in courts that "*might* issue a controlling precedent." Doc. 200, at 14 (emphasis added); *see* Doc. 188-1, at 20 ("The CBA submitted the second of these amicus briefs as an exhibit to the CBA's motion for permanent injunction and declaratory relief."); Doc. 190, at 18.

The attorneys before the Tenth Circuit and Supreme Court were well qualified to successfully challenge the contraceptive mandate without LRRC's assistance. Counsel concedes that plaintiffs' counsel before the Tenth Circuit in *Little Sisters* were "seasoned," but argues that the LRRC moot court was necessary because they "had little Tenth Circuit experience." Doc. 200, at 14. Regardless of the marginal benefit of experience advocating before a particular court, the *Little Sisters* plaintiffs assembled a highly specialized and experienced team of appellate religious liberty advocates before the Tenth Circuit. Lead counsel Mark Rienzi, who provided a declaration supporting LRRC's attorneys' fees (Doc. 188-2), was on the successful 2013 *Hobby Lobby* litigation team before the Tenth Circuit *en banc* and is an experienced "religious liberty litigator and scholar." Doc. 188-1, at 6; *see Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1120 (10th Cir. 2013), *aff'd sub nom. Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751 (2014). "[T]he law firms representing

---

Benefits Association and The Catholic Insurance Company, as *amici curiae* in support of Petitioners, *Zubik v. Burwell*, Nos. 14-1418, 14-1453, 14-1505, 15-35, 15-105, 15-119, & 15-191 (January 11, 2016), Doc. 161-1; Doc. 188-1, at 19–20.

the plaintiffs in the three [Tenth Circuit] Mandate cases . . . already had more than sufficient 'staffing' for a moot court."[8] Government's Response, Doc. 190, at 21. *Cf Case*, 157 F.3d at 1252 ("If an attorney is consulting on a case, the assistance provided must be actually necessary or essential to proper representation rather than merely comforting or helpful.").

Perhaps aware that the moot court was unnecessary, Counsel alternatively frames it as "CBA['s] . . . opportunity to test its arguments, in what constituted a real life mock trial." Doc. 200, at 14. But none of the cases "grant[ing] fees for focus groups, mock juries, [or] similar litigation tools" that Counsel cites dealt with moot work in *other* cases. *Id.* It is disingenuous for Counsel to argue that LRCC should be compensated for appellate moot court work when (1) the Tenth Circuit abated the appeals in this case, (2) there were no pending trials or oral arguments to prepare for in *CBA I* or *CBA II*, and (3) Plaintiffs were not parties to the *Little Sisters* Tenth Circuit case.

As to *Zubik* plaintiffs' attorneys before the Supreme Court—former U.S. Solicitor General Paul Clement and current Solicitor General Noel Francisco—that team's abilities and the dozens of other amici show the absurdity of arguing that any one of Counsel's amicus briefs was necessary to a favorable outcome in this case. This is especially true given that the Supreme Court ultimately "expresse[d] no view on the merits of the cases," which undermines Mr. Rienzi's contention that "LRRC's amicus briefs made important contributions to the *favorable* outcome in *Zubik* . . . ." *Zubik*, 136 S. Ct. at 1560; Doc. 188-2, at 7 (emphasis added). Accordingly, the Court deducts all hours from this "Litigation: Other"

---

[8] Mr. Rienzi was already organizing his own moot court to prepare for oral argument when on May 22, 2014, Counsel "offer[ed] to assist . . . ." Ex. 1 – Adjusted Fees.

category.

### c) Corporate

The Court also deducts all fees for work in the "Corporate" category. It may seem obvious that a party cannot recover fees in civil rights litigation for hours expended on corporate or transactional work, but the issue is not so clear. LRRC's "Corporate" work occurred in two stages. Stage 1 is 2013–14 groundwork building the CBA for this case—in order to create "a Catholic ministry capable of invoking associational standing so it could bring this case for all its members," LRRC "prepared CBA's organizational documents and membership application forms and included within those documents many unique provisions necessary to establish" CBA members' uniformity of beliefs and burden from the contraceptive mandate. Doc. 188-1, at 10. LRRC also recruited a CBA board of directors and created an ethics committee that consulted with attorneys and religious bodies to assess whether the Government's rule changes burdened Catholic beliefs. *Id.* at 10–11. At Stage 2 post-filing, LRRC maintained and grew the CBA with tasks like board meetings, member recruitment, marketing, press releases, webinars, website maintenance, and emails.

While much of the Stage 1 work was reasonably expended on matters that allowed Plaintiffs to prosecute their case more efficiently, this does not transform transactional work into compensable litigation work. Essentially, Counsel's argument boils down to two arguments: (1) Plaintiff CBA likely would not have had standing to sue in this case without laying the groundwork for associational standing, *see* Order Granting Permanent Injunction, Doc. 68, at 5, 8–10; Burrage Declaration, Doc. 188-3, at 5; and (2) the litigation would have been more complicated and lengthy without this corporate work.

To the first point, the component employers of the CBA would still have been able to sue absent Stage 1 work. Associational standing was not the only way to prevail in this litigation; rather, a class action may have required the same amount of work in the aggregate. And to the second point, transactional attorneys work in anticipation of litigation all the time; but once the client ends up litigating, the firm will not consider that transactional work part of the litigation for billing purposes. In other words, Counsel attempts to capitalize on LRRC's role as a one-stop shop for all of the CBA's legal matters—regulatory, corporate, advocacy, and litigation—with Counsel Martin Nussbaum acting as CBA's general counsel. Doc. 197, at 10; Doc. 188-1, at 5. That does not make every matter compensable in litigation against the Government. Counsel basically conceded this point by separating Plaintiffs' billing invoices into four categories ("Litigation," "Corporate," "Member services," and "Morally compliant insurance"), meaning the Corporate Stage 1 "tasks sought to be charged to the adverse party would normally be billed to a paying client" separate from the bills for work "*on the litigation.*" *Ramos*, 713 F.2d at 554; *Webb*, 471 U.S. at 242.

Stage 2 "Corporate" work differs from litigation even more than Stage 1 work. Hours planning and attending board meetings are non-compensable for the same reasons as above. Counsel characterizes press work as recruiting potential class members and educating current ones, but he offers no evidence to support that claim; the Court is left to assume that these press releases were purely promotional and therefore non-compensable. Doc. 200, at 12 & n.14; *see Rum Creek Coal Sales, Inc v. Caperton*, 31 F.3d 169, 176 (4th Cir. 1994) ("The legitimate goals of litigation are almost always attained in the courtroom, not in the media."); *Davis v. City & Cnty. of San Francisco*, 976 F.2d 1536, 1545 (9th Cir. 1992) ("Where . . .

press conferences and [the] performance of. . . public relations work is *directly and intimately related* to the successful representation of a client, private attorneys do such work and bill their clients. Prevailing civil rights plaintiffs may do the same.") (emphasis added).

The rest of the Stage 2 work with CBA members—recruitment, marketing, webinars, website maintenance, and emails—were only spent "*on the litigation*" to the extent attorneys were actually recruiting potential class members or fulfilling their obligation to consult with Plaintiffs and apprise them of developments in the case. *Webb*, 471 U.S. at 242. Counsel has made it practically impossible to discern which "Corporate" hours meet this description by inexplicably categorizing seemingly identical "Corporate" matters in the "Litigation: General" or "Member Services" categories. Take webinars as just one example. Counsel categorizes as "Corporate" the following matters: "Prepare presentation for webinar" (11/25/2013), "Conference . . . re webinar" (1/28/2014), and "Prepare presentations to members for webinars" (6/25/2014). *See* Ex. 1 – Adjusted Fees. But he also categorizes indistinguishable tasks as "Litigation: General": "Prepare webinar slides for report on litigation" (6/22/2014), "Review of materials from CBA webinar" (10/9/2014), and "meeting . . . regarding upcoming CBA member webinar" (4/18/2016). *Id.* And he categorizes as "Member Services," "schedule membership webinar and communication with each presenter" (2/27/2015), "Email regarding 3/12 webinar planning meeting" (3/10/2015), and "Prepare for 3/31 CBA webinar" (3/27/2015). *Id.* Perhaps some of these webinars focused on litigation and some on unrelated corporate matters, but "[i]t remains counsel's burden to prove and establish the reasonableness of each dollar." *Mares*, 801 F.2d at 1210. Without a logical explanation, the Court can only assume that matters labeled "Corporate" were not

expended "on the litigation." *Hensley*, 461 U.S. at 433

Given this failure to differentiate between billable and non-billable tasks, the lack of evidence to substantiate that work was tied to class member recruitment, and Counsel's apparent concession that it is "time recorded under 'member services'"—rather than "Corporate"—that "was spent helping members understand" the litigation, the Court finds the remaining Stage 2 "Corporate" hours unreasonable. Doc. 200, at 13.

### d) Member services

The Court next deducts half of the hours in the "Member Services" category for two reasons. First, as with the "Corporate" category, Counsel's disparate categorization of identical matters in "Member Services" and "Litigation: General" makes it impossible to differentiate which client communications like webinars, website work, and emails were necessary to representing Plaintiffs effectively.

Second, the "Member Services" category appears to be a catch-all for any advice LRRC provided to CBA members at the intersection of religion and employment law, regardless of its relation to this contraceptive-mandate litigation. "CBA '[m]ember services include consultations regarding moral and legal issues from preeminent legal and religious experts, practical business guidance, and educational resources in the areas of employment and benefits.'" Doc. 197, at 12 (quoting CATHOLIC BENEFITS ASSOCIATION, *FAQ*, https://catholicbenefitsassociation.org/about/faqs/). Counsel believes that all of these member services concern this litigation, but the Tenth Circuit has been clear to distinguish between work actually on the litigation and work "ensuring that the problems motivating the [litigation] have been eliminated." *Johnson v. City of Tulsa, Okla.*, 489 F.3d 1089, 1108–09

(10th Cir. 2007). Only hours expended on the former are compensable. *Id.* Moreover, of the CBA's $1.50-per-employee monthly membership fee to pay for services, "[h]alf [is] allocated to litigation fees" and "half [is] allocated to dues." *FAQ*. Thus, it seems that about half of "[t]hese Member Services . . . were not performed on the litigation, but rather, consist of the general services that CBA members are promised upon joining the association." Doc. 197, at 12. A fifty-percent deduction of "Member Services" matters is warranted, which the Court indicates in orange. *See* Ex. 1 – Adjusted Fees.

### e) Travel

It is unreasonable to bill a client for time spent travelling at the same rate for time actually working. "[A]n attorney's [travel] time, while necessary, is essentially unproductive and, therefore, compensable at a reduced hourly rate." *Smith v. Freeman*, 921 F.2d 1120, 1122 (10th Cir. 1990). Although some of the billing records indicate billing judgment in this regard—"Transit from Colorado Springs to Oklahoma City (6.00 hours; billed at 50% rate)," Ex. 1 – Adjusted Hours (5/7/2014, L. Martin Nussbaum)—many do not, and the Court deducts fifty percent from travel-only time entries billed at the top rate, indicated in orange. There are also four travel-related entries where Counsel, attempting to show that the Government exaggerated Plaintiffs' excess, conceded that he and Eric Kniffin worked significantly less than the amount billed;[9] those seventy-percent deductions are in green. *See* Doc. 201-7; Ex. 1 – Adjusted Fees (4/28/2015–4/29/2015).

---

[9] Counsel cannot have his cake and eat it too. He claims to have "worked" 10.5 hours on April 28, 2015— "Transit to Oklahoma City for argument; review and outline issues . . . for final preparation of Mr. Kniffin"— but "billed" 7.5 hours. Then when the Government included these 7.5 hours in its chart showing LRRC's excessive preparation time for the April 29, 2015 hearing, Counsel called that chart "overbroad" and said that he "actually spent" only 2 hours on preparation. Doc. 197-7; Doc. 201, at 7–8; Doc. 201-7.

### f) Attorneys' fees litigation

Unsurprisingly, Counsel requests an excessive amount of fees ($210,875 for 441 hours) for litigation about a fees application that itself is wildly excessive. Attorneys are generally entitled to "at least some compensation . . . for work reasonably expended on the fee application." *Mares*, 801 F.2d at 1206. "There is a difference, however, between time necessary to prepare and submit an application for fees"—which took Counsel 140 hours— and the remaining 301 "hours spent disputing a fee award. The latter are especially suspect, and may be disallowed in their entirety." *Id.* ("[H]ours not spent representing the client are at best on the borderline of what Congress intended to be compensable."); *see* Ex. 1 – Adjusted Fees (4/2/2018–7/16/2018). Given Counsel's excessive time litigating fees and consistent failure to abide by Local Rules and the Court's orders throughout the fees litigation, the Court bars all recovery for attorneys' fees work done after April 21, 2018, when Counsel submitted the Motion for Attorneys' Fees. *See* Doc. 188; *supra* Part I(B)(3) & nn. 2, 6.

But even for work expended on the initial attorneys' fees application, awarding full recovery of those 140 hours would ignore Counsel's (1) lack of success in his motion for fees,[10] (2) initial withholding of billing records that facilitated his rate misrepresentation, and (3) seeking compensation for categories of work clearly outside the scope of this litigation. *See Mares*, 801 F.2d at 1207 ("Congress [did not] intend[] to award fees solely for fruitless work in seeking them. Compensation for labor invested in a fee application must be joined with and ancillary to compensation for necessary professional representation on the merits of the case."). Counsel frames this time preparing the fees application as "less than 2.5% of the

---

[10] Excluding time spent litigating attorneys' fees, Counsel will only recover around 24% of fees requested.

overall hours of effort," but that argument carries less weight when the "overall hours" are equally excessive. Doc. 188, at 7. The Court therefore deducts eighty percent of the fees devoted to preparing the Motion for Attorneys' Fees (Doc. 188), indicated in blue.

### g) Post-injunction

Attorneys' fees work is not the only kind that Counsel billed after Plaintiffs prevailed in this case. In April and June 2018, after the March permanent injunction, Counsel billed 4.9 non-compensable hours on updating "template letters for CBA members" and reviewing permanent injunctions granted in other cases. *See* Ex. 1 – Adjusted Fees (4/25/2018–4/27/2018, Eric N. Kniffin); *id.* (6/12/2018–6/13/2018, Eric N. Kniffin and L. Martin Nussbaum). It is unclear what these templates were exactly, Counsel offers no evidence that this work was necessary to "protect[] the fruits of victory," and the Court finds these hours unreasonable. *Johnson v. City of Tulsa, Okla.*, 489 F.3d 1089, 1109 (10th Cir. 2007).

### h) Block billing

Counsel also block billed in various ways that frustrated the Court's ability to conduct a thorough reasonableness inquiry. Block billing is "the time-keeping method by which each lawyer and legal assistant enters the total daily time spent working on a case, rather than itemizing the time expended on specific tasks." *Robinson*, 160 F.3d at 1284 n.9 (quoting *Harolds Stores, Inc. v. Dillard Dep't Stores, Inc.*, 82 F.3d 1533, 1554 n. 15 (10th Cir. 1996)). It is particularly concerning "in a situation where a party is seeking to have his opponent pay for his own lawyer's work." *Id.* at 1284.

For the most part, Counsel's "summaries of the tasks are quite specific," but they "do not allocate the precise amounts of time spent on each particular task during each individual

day." *Id.* at 1285. For example, the Court has no ability to assess whether on April 4, 2014, Counsel spent a reasonable number of hours on any particular task in the following seven-and-a-half hour, block-billed list:

> Review court's order granting motion for leave to file amicus brief; conference with Mr. I. Speir re same; revision of stipulations; phone conference with colleagues re same; phone conference with Mr. M. Pollack re same; review ACLU brief; conference with Mr. I. Speir and Mr. E. Kniffin re our response to the ACLU's argument re effect on third parties; second phone conference with Mr. M. Pollack re effect on third parties; third conference with Mr. M. Pollack re proposed stipulated order; draft separate motion for enlargement of pages; revise same; prepare outline for reply brief; conference with Mr. I. Speir and Mr. E. Kniffin re same

Ex. 1 – Adjusted Fees. This is especially troubling seeing as many of the block-billed time entries tend to camouflage duplicative time LRRC attorneys, of which there were nineteen in this case,[11] billed conferencing with one another. *See Sinajini v. Bd. of Educ. of San Juan Cty. Sch. Dist.*, 53 F. App'x 31, 34–35 (10th Cir. 2002) (unpublished); *Case*, 157 F.3d at 1252–53; *New Mexico Citizens for Clean Air & Water v. Espanola Mercantile Co.*, 72 F.3d 830, 835 (10th Cir. 1996); Doc. 197, at 19–22. When the Government alerted Counsel to this concern, Counsel declined to "supplement[] these billing statements with . . . the specific amounts of time allocated to each individual task." *Robinson*, 160 F.3d at 1285; *see* Doc. 197, at 22–24; Doc. 200, at 9–10.

Thus, the Court deducts by twenty percent, indicated in yellow, (1) the most egregiously block billed time entries and (2) entries in which even though it appears that

---

[11] Counsel argues that the Government "used over twice as many attorneys as CBA," but (1) that is only true if Counsel ignores the four CBA attorneys he removed from his fees request after the opening brief; (2) it appears that at least half of the Government's attorneys were involved in this case exclusively for settlement purposes; and (3) the Government does not compare easily to a private law firm when considering staffing and decision-making. Doc. 200, at 5; Doc. 200-1.

attorneys spent the majority of time on compensable matters, the time is block-billed with non-compensable or deducted matters. By contrast, where it appears a time entry is about equally divided between compensable and non-compensable matters, the Court applies a seventy-percent deduction, indicated in green, to account for the non-compensable matters and a twenty-percent block-billing deduction.[12] *See* Ex. 1 – Adjusted Fees.

### i) Top-heavy billing

One issue not raised by the parties is particularly troubling—the unreasonably "top-heavy" division of labor between LRRC senior attorneys and associates. *Bridgeport Music, Inc. v. Rhyme Syndicate Music*, 376 F.3d 615, 627 (6th Cir. 2004). Partner and of counsel attorneys completed 84–87 percent of the hours in this case. *See* Ex. 2 – Hours By Attorney. "[T]here is work that may be ably done by an associate, such as research, compiling documents, and drafting motions, the value of which is not enhanced merely because it is done by a senior partner." *Am. Petroleum Inst. v. U.S. E.P.A.*, 72 F.3d 907, 916 (D.C. Cir. 1996); *see also Pig Newton, Inc. v. The Boards of Directors of The Motion Picture Indus. Pension Plan*, No. 13-CIV-7312-KPF, 2016 WL 796840, at *7 (S.D.N.Y. Feb. 24, 2016); *Driscoll v. George Washington Univ.*, 55 F. Supp. 3d 106, 115 n.5 (D.D.C. 2014). The Court recognizes this was a complex case. With LRRC senior partner Martin Nussbaum serving as CBA's general counsel, perhaps Plaintiffs wanted his particular attention and experience, which could explain apportioning more work to senior attorneys.[13] Senior attorneys are also

---

[12] The Court also added a red "X" to some category cells to indicate time entries that Counsel inadequately labeled. *See* Ex. 1 – Adjusted Fees.

[13] While there are very few associates in LRRC's Colorado Springs office, it appears that the majority of attorneys who worked on this case came from outside the Colorado Springs office at LRRC's Denver and Phoenix offices, which are staffed with several associates. *See* Doc. 188-1, at 48; Lewis Roca Rothgerber Christie, *People* and *Locations*, https://www.lrrc.com/.

often able to complete certain tasks more cost-effectively, despite their higher rates, based on experience.

Nonetheless, the billing records are replete with basic legal research and drafting work that could have been assigned to associates at lower billing rates. For example, much of the work in this case involved monitoring developments in other contraceptive-mandate cases and repurposing prior arguments into motions to amend the Court's preliminary injunction, four of which were filed under the Court's streamlined and formulaic framework. *See* Docs. 107, 112, 124, 134, 145. While assigning more work to partners than associates is not per se unreasonable, the particular facts of this case and the 84–87 percent ratio here warrant a ten-percent deduction of all compensable "Litigation: General" hours not already deducted above, a cut tailored to matters that could have been assigned to associates.

## 2. Hourly rate

"[T]he second half of calculating an appropriate fee award is multiplying the hours by a *reasonable rate*." *Malloy*, 73 F.3d at 1018. Counsel's proposed rates are also unreasonable. A reasonable rate usually depends on "what lawyers of comparable skill and experience practicing in the area in which the litigation occurs would charge for their time . . . in civil rights or analogous litigation." *Ramos*, 713 F.2d at 555. The relevant community in attorneys' fees disputes before the Court is usually the Oklahoma City legal market, despite that LRRC's office is in Colorado Springs, Denver. *Id.* However, Counsel may exceed this local rate by showing that the issues are "so unusual or require[] such special skills that it could not be handled by reasonably competent trial lawyers in" Oklahoma City. *Id.* It is up to Counsel to "produce satisfactory evidence—in addition to the [his] own affidavits—that the requested

rates" meet the above reasonableness standard. *Malloy*, 73 F.3d at 1018 (quoting *Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984)).

As to the eight attorneys who performed reasonable work not deducted above, Counsel argues that hourly rates of $335–$610 for attorney work and $250 for paralegal work are reasonable "for the skill, experience, and reputation of the attorneys and paralegals who worked on this matter" in light of this case's "extraordinary complexity" and LRRC's "outstanding job advocating" for Plaintiffs. Doc. 188, at 5; Nussbaum Declaration, Doc. 188-1, at 5–6, 48, 57–68 (LRRC qualifications, litigation rates, and resumes); Doc. 188-2, at 4, 7. He also relies on a declaration from retired United States District Judge Michael Burrage to show that "the hourly rates requested by LRRC are reasonable from a national perspective or in the Oklahoma City legal market." Doc. 188, at 3; Doc. 188-3, at 6.

Counsel's arguments fall short at each turn. First, Counsel exaggerates the results obtained and complexity. LRRC obtained a laudable win on Plaintiffs' RFRA claim, avoided billions in Government fines, and achieved permanent injunctive relief. Yet, those results became far more attainable once the Government decided to stop defending the contraceptive mandate in 2017. The number of CBA member employers overstate the litigation's complexity. Doc. 188-1, at 4, 7–9. The Supreme Court warned that unlike the attorneys' fees calculation in "common fund" cases "where a reasonable fee is based on a percentage of the fund bestowed on the class," the number of plaintiffs represented is not "a consideration of significance in calculating fees under § 1988." *Blum*, 465 U.S. at 900 n.16. "Presumably, counsel will spend as much time and will be as diligent in litigating a case that benefits a small class of people, or, indeed, in protecting the civil rights of a single individual." *Id.* The

potential fine amount is equally misleading because it is merely a multiplier of the number of employees working for CBA members and $100 per non-compliant day. Doc. 188-1, at 7 (citing 26 U.S.C. § 4980D). The stakes were higher with more CBA members, but each additional CBA member did not make this case any more difficult. Similarly, Counsel's attorneys' fees request is no more reasonable when framed as "$3,104 per employer." Doc. 200, at 1.

Second, LRRC's billing invoices reveal that these supposedly "reasonable" market rates requested in Counsel's opening brief were *nearly thirty-five percent higher* than those billed to the clients. *See supra* Part I(B)(1) at 6 n.3. The market in this case demanded far lower rates than Counsel would have the Court believe.

Third, regardless of what LRRC actually billed its clients, the Court is not obligated to defer to those rates if inconsistent with rates in the relevant community. *Ramos*, 713 F.2d at 555. "A client may choose the 'Cadillac' of law firm representation," but that client "is not automatically entitled to have an opposing party make the car payments." *Grynberg v. Ivanhoe Energy, Inc.*, No. 08-CV-02528-WDM-BNB, 2011 WL 3294351, at *6 (D. Colo. Aug. 1, 2011); *see Beard v. Teska*, 31 F.3d 942, 956 (10th Cir. 1994), *abrogated on other grounds by Buckhannon Bd. & Care Home, Inc. v. W. Virginia Dep't of Health & Human Res.*, 532 U.S. 598 (2001) ("[W]hen it comes down to fee shifting . . . the higher cost of [a] . . . specialist cannot properly be thrust on someone who did not, after all, make the uneconomic choice of counsel."); *Praseuth v. Rubbermaid, Inc.*, 406 F.3d 1245, 1257 (10th Cir. 2005).

Fourth, whereas Judge Burrage's declaration refers generally to his knowledge of rates for comparable legal services "in the Oklahoma City legal market," the Government submits

specific evidence of Oklahoma City hourly rates in various cases. Doc. 188-3, at 6; *see* Doc. 190, at 27–28; Doc. 190-1, at 83–96. Granted, those cases do not compare well to this one's complexity and the experience of LRRC's highly specialized religious institutions group. Plaintiffs faced standing issues, regulatory changes, questionable Government representations, and the need to monitor developments in similar cases nationwide. A law firm in this market likely would not have been similarly equipped to handle such a contentious religious liberties dispute implicating over a thousand employers. However, the Government's evidence demonstrates that even increasing the rates somewhat to account for case complexity and attorney quality, Counsel's requested rates remain beyond the scope of reasonableness in Oklahoma City.

In light of the unique circumstances of this case, the Court employs a hybrid approach. The following reasonable rates reflect both customary Oklahoma City rates *and* the national scope of this work:

| Attorney | Position | Graduation year | Requested Rate | Billed Rate | Gov. Proposal[14] | Final Rate |
|---|---|---|---|---|---|---|
| H. William Mahaffey | Partner | 1980 | $610 | $450-530 | | **$470.00** |
| Jan Steinhour | Partner | 1982 | $610 | $475–90 | | **$470.00** |
| L. Martin Nussbaum | Partner | 1985 | $610 | $465–550 | $450 | **$470.00** |
| Eric Hall | Partner | 2000 | $510 | $375–90 | | **$360.00** |
| Eric N. Kniffin | Of Counsel | 2003 | $440 | $325–95 | $350 | **$350.00** |
| David M. Hyams | Associate | 2008 | $340 | $270 | | **$270.00** |
| Ian S. Speir | Associate | 2011 | $420 | $225–380 | $250 | **$250.00** |
| John M. Guevara | Summer Associate | 2015 | $335 | $150 | | **$150.00** |
| Arlene K. Martinez | Paralegal | 32 yrs. exp. | $250 | $190–225 | $110 | **$130.00** |

*See* Ex. 1 – Adjusted Fees. These final rates multiplied by the lodestar-adjusted hours would

---

[14] The Court's final rates closely resemble the Government's proposed rates, despite its reliance on dissimilar cases, because the Government's rates are generally higher than those in the cases and affidavits relied on. *See* Doc. 190, at 27–28.

result in $1,272,229 in attorneys' fees.

## B. *Johnson* Factors

The Court next applies the *Johnson* factors not already "subsumed within the initial [lodestar] calculation" to decide if it is necessary to "adjust the fee upward or downward." *Hensley*, 461 U.S. at 434 & n.9 (citing *Johnson*, 488 F.2d at 717–19).

> The 12 factors are: (1) the time and labor required; (2) the novelty and difficulty of the question; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorney; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*Delaware Valley*, 478 U.S. at 562 n.7. "The 'novelty [and] complexity of the issues,' 'the special skill and experience of counsel,' the 'quality of representation,' and the 'results obtained' from the litigation are . . . fully reflected in the lodestar amount, and thus cannot serve as independent bases for [adjusting] the basic fee award." *Id.* at 565 (quoting *Blum*, 465 U.S. at 898–900). The parties do not raise arguments related to the preclusion of other employment, time limitations, undesirability of the case, or nature and length of the attorney-client relationship, and the Court sees no reason why these factors would militate a lodestar adjustment. The Court also considered the "customary fee" and fee-arrangement factors above, and therefore turns to two *Johnson* factors at issue—the time and labor required and the awards in similar cases.

### 1. Time and labor required

The parties sharply contest the time and labor required in this case, one of dozens of similar contraceptive-mandate cases filed across the U.S. At essentially every turn in this

litigation, LRRC essentially had templates to use from "35 similar cases that preceded this one." Doc. 190, at 6–7 & n.1. This should have saved significant time in drafting the *CBA I* complaint and motion for preliminary injunction. When Plaintiffs filed a new lawsuit in *CBA II*, most of the filings in that case were repetitive of these two *CBA I* filings. *Id.* at 8–9. Moreover, neither suit involved discovery, summary judgment briefing, trial, or merits briefing on appeal. Nonetheless, LRRC attorneys—experienced religious liberty litigators who should work more efficiently than the average attorney—billed over 6,000 hours and concede to having spent 135.2 hours drafting the *CBA I* complaint, 123.4 hours on the motion for class certification, and 99.6 hours researching and drafting a brief on forum shopping. *See* Ex. 1 – Adjusted Fees ("Billed Hours"); Doc. 197, at 17–18; Doc. 201, at 5–8; Docs. 201-6; 201-7; 201-9; 201-10. The Court already deducted some of these hours above as unreasonable, but they serve as further evidence of LRRC's excessiveness at every stage of this litigation.

Also beyond the lodestar calculation is the full scope of Counsel Martin Nussbaum's excess. His loquaciousness sometimes doubled the time in routine status conferences and hearings; his briefs were often discursive; and his first resort for an issue was usually filing for court intervention before conferring with opposing counsel. Granted, the Government is not beyond reproach; their litigating positions and regulatory practices contributed greatly to the time and labor required. Counsel characterizes the Government as "arsonists who set a house on fire, fanned the flames, then complained [that] the firefighters used too much water." Doc. 200, at 1. This was a big litigation fire with enormous stakes for these Catholic employers, but finger-pointing cannot distract from the fact that Counsel "responded

inappropriately to defendants' unreasonable efforts" by pointing a ceaseless fire hose at both this fire *and others* in cases Plaintiffs were not parties to. *Case*, 157 F.3d at 1254.

## 2. Awards in similar cases

Although the Government cites attorneys' fees cases that do not compare perfectly with this one, Plaintiffs' Counsel unduly relies on the $3 million fee settlement agreement the Government reached in October 2017 with Jones Day attorneys to settle sixteen lawsuits challenging the contraceptive mandate. *See* Doc. 190, at 16; Doc. 200, at 7–9 (citing Zoe Tillman, *The Trump Administration Agreed To Pay More Than $3 Million In Legal Fees To Settle Contraception Mandate Lawsuits*, BUZZFEEDNEWS (Jan. 9, 2018), https://www.buzzfeed.com/zoetillman/the-trump-administration-agreed-to-pay-more-than-3-million); Doc. 200-2, at 7, 16–17. The agreement offers no context into those cases' litigation history, and Counsel's attempts to make this case seem more labor-intensive and successful are unpersuasive. *See Case*, 157 F.3d at 1251 ("We note that while the legal principles applied in each § 1988 case are the same, the ultimate percentage of fees awarded is necessarily specific to the facts of the particular fee request.").

Jones Day attorneys brought sixteen lawsuits in thirteen districts across nine circuit courts of appeals; Plaintiffs brought two lawsuits in one district and one circuit. Doc. 200-2, at 16–17. Plaintiffs represented far more employers, but as the Court has shown, the number of plaintiffs is not a helpful indicator of the case's complexity or labor required. Nor do the results obtained portray a full picture of the litigation. While Jones Day attorneys only secured a settlement agreement, rather than a permanent injunction and declaratory relief like Plaintiffs obtained, that agreement binds the Government "to abide by the terms of the

permanent injunction in *Zubik v. Sebelius* . . . ." Doc. 200-2, at 4. Jones Day only had a 7-of-15 record in the district courts and 0-of-9 in the courts of appeals, but ultimately the Government conceded the same RFRA violation, rendering Jones Day-represented plaintiffs "prevailing part[ies]" just like these Plaintiffs. Doc. 200, at 8. Counsel also concedes that "Jones Day did extensive appellate work," which LRRC did not, making it far more reasonable that Jones Day merits briefing in the courts of appeals produced such a high fee award. *Id.* at 9.

The very fact that Jones Day's fees award resulted from a settlement and was not subject to rigorous judicial scrutiny is reason enough to doubt its applicability. Just as clients sometimes agree to "Cadillac" fee arrangements, so can the deep-pocketed Government when it wants to put an end to litigation. The Court has no way of scrutinizing the Government's decision in those Jones Day cases, nor is it clear what attorneys' fees negotiations occurred in this case. The CBA's alleged "disparate treatment by the Departments" as to fees may be well-founded after all. *Id.* at 9. Lastly, assuming the Jones Day settlement is relevant, it would not necessarily favor a higher award. Jones Day "originally asked for more than $29 million" in fees and the Government settled on ten percent of that; the Court, meanwhile, is awarding LRRC attorneys over twenty percent of their requested fees. Tillman, *supra*. Jones Day also received $187,500 in fees per case, whereas the Court is awarding nearly double that amount.

## C. Post-Lodestar Deduction

After considering the *Johnson* factors, the Court adjusts the fees award downward by forty-five percent. *See* Ex. 1 – Adjusted Fees ("Post-Lodestar Deduction"). Ten percent accounts for the time and labor required and thirty-five percent accounts for Counsel's billing

rate misrepresentation.

Counsel withheld billing records and suggested by inference that LRRC billed Plaintiffs nearly thirty-five percent more than it actually did. *See supra* Part I(B)(1) at 6 n.3. Counsel represented that "the Court need not speculate as to what hours would reasonably have been billed to a client, because LRRC *did* bill the Catholic Benefits Association for the hours reported in Martin Nussbaum's declaration." Doc. 188, at 6. Then even after the Court requested billing records and Counsel's markup became evident, he argued that LRRC's proposed "rates are reasonable" based on "perfect proof of [the] market value for legal services," what the CBA actually paid. Doc. 200, at 2–3. "The CBA continued to pay for these billed hours when . . . victory seemed like a long shot." *Id.* at 3. But the CBA did not pay "*these* billed hours"—a market for legal services depends on the rate offered, and Plaintiffs never paid LRRC anywhere near the amount they are requesting. *Id.* (emphasis added). This was more than just an omission. This was a misrepresentation at best.

The Court's downward adjustment is vital "to deter attorneys from 'mak[ing] unreasonable demands, knowing that the only unfavorable consequence of such misconduct would be reduction of their fee to what they should have asked for in the first place.'" *See Case*, 157 F.3d at 1254 (quoting *Brown v. Stackler*, 612 F.2d 1057, 1059 (7th Cir. 1980). Rather than "awarding no fees at all" for Counsel's "outrageously excessive request"—a method employed by at least four circuits—the Court finds this proportional sanction sufficient. *Id.* (citing *Envir. Defense Fund, Inc. v. Reilly*, 1 F.3d 1254, 1258–60 (D.C. Cir. 1993); *Fair Housing Council v. Landow*, 999 F.2d 92, 96–97 (4th Cir. 1993); *Lewis v. Kendrick*, 944 F.2d 949, 958 (1st Cir. 1991); *Stackler*, 612 F.2d at 1059). The post-lodestar

deduction leaves Plaintiffs with a final fee award of $699,725.95.

**D. Costs**

Many of LRRC's requested costs not recoverable under 28 U.S.C. § 1920 are also not compensable under Section 1988 for the reasons above—lack of substantiation or they were expended on non-litigation matters. Counsel has the burden "to establish the amount of compensable costs and expenses to which they are entitled." *Mares*, 801 F.2d at 1208. The Court looks to the billing records for context where possible, but to the extent Counsel labels costs generally, "[t]rial courts are justified in denying compensation where the affidavits and time records in the fee submissions fail to differentiate adequately between the costs attributable to billable and non-billable items." *Id.* at 1209; *see* Ex. 3 – Adjusted Costs. Even for costs that are substantiated and pertain to this litigation, "out-of-pocket costs . . . normally absorbed as part of law firm overhead may [not] be reimbursed under 42 U.S.C. § 1988." *Ramos*, 713 F.2d at 559. Counsel separates costs into four categories that the Court addresses in turn: (1) travel, food, and lodging; (2) *pro hac*, PACER, and related fees; (3) postage and deliveries; and (4) legal research.

**1. Travel, Food, and Lodging**

Typically "there is no need to employ counsel from outside the area," rendering travel costs non-compensable, but this is an "unusual case[]" warranting a "[d]eparture from th[e] rule." *Ramos*, 713 F.2d at 559; *see supra* Part II(A)(2) (quoting *Ramos*, 713 F.2d at 555) ("[T]he issues are 'so unusual or require[] such special skills that [the case] could not be handled by reasonably competent trial lawyers in' Oklahoma City."). Counsel is therefore entitled to compensation for travel, food, and lodging to Oklahoma City for hearings and

Washington, D.C. for settlement discussions. However, the Court deducts twenty percent of compensable travel costs labeled "Travel Expense" or "Travel & Lodging" that fail to include (1) which, or least how many, attorneys travelled, or (2) specific costs of flights versus meals or lodging. *See* Doc. 190, at 30; Ex. 3 – Adjusted Costs. Without this information, the Court cannot scrutinize travel costs, which is particularly important in a case like this with billed matters unrelated to this litigation. The Court also declines to award the following costs, several of which Counsel fails to explain why they are compensable ("unsubstantiated"):

- Client lunch, 11/4/13—unsubstantiated

- Baltimore travel, lodging, and food for corporate matters, 11/22/2013, 12/9/2013, 12/3/2014, 12/15/2014, 11/15/2016, 11/16/2016

- Lunch for corporate matters, 6/11/14

- Flight change fee for preliminary injunction hearing, 6/25/14—unsubstantiated

- "Mileage/meal w/Louis Brown," 9/12/14—unsubstantiated

- Denver travel for Tenth Circuit oral argument, 12/12/14, 12/15/14, 2/4/15—the Tenth Circuit posted recordings online of oral argument for the contraceptive-mandate cases, *Little Sisters of the Poor Home for the Aged*, *Reaching Souls International*, and *Southern Nazarene University*. *See Oral Argument Recording Archive*, THE UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT, https://www.ca10. uscourts.gov/clerk/oral-argument-recording-archive

- Travel to United Conference of Catholic Bishops meeting, 7/9/15, 7/24/15—unsubstantiated

- Philadelphia travel and parking for corporate matters, 7/17/15, 8/13/15, 10/8/15, 11/6/15

- Travel to Franktown for corporate matters, 12/22/15

- Castle Rock conference for corporate matters, 1/27/17, 10/19/17

- CBA General Assembly Meeting in Kansas City, MO, 11/2/17–11/3/17—unsubstantiated

### 2. *Pro Hac*, PACER, and Related Fees

LRRC can recover PACER fees for tracking developments in other contraceptive-mandate cases, but the Court deducts ten percent of these fees to account for the various excesses described above. The Court also declines to award the following costs:

- Filing fees with the Oklahoma and Colorado Secretaries of State for corporate matters, 11/4/2013, 4/30/2015, 7/19/2016, 10/27/162z1

- Fees for certificates of good standing from the Colorado Supreme Court and U.S. District Court for the District of Colorado, 3/10/13, 4/18/14—this district's *pro hac vice* request form merely requires counsel to "list all state and federal courts or bar associations in which [they] are a member 'in good standing' to practice law"; certified copies are unnecessary. Docs. 17-1, 18-1, 19-1.

### 3. Postage and Deliveries

Postage and delivery fees are not recoverable because they are normally absorbed as overhead expenses by firms in this district. *Clerk's Guidelines for Taxation of Costs in the Western District of Oklahoma*, Part IV(G), http://www.okwd.uscourts.gov/wp-content/uploads/2015/01/Taxation-of-Costs.pdf ("[P]ostage . . . [is] traditionally absorbed in the 'overhead' of a law practice . . . ."); *Christ Ctr. of Divine Philosophy, Inc. v. Elam*, No. CIV-16-65-D, 2017 WL 4204029, at *5 (W.D. Okla. Sept. 21, 2017).

### 4. Legal Research

The Court is unable to discern whether LRRC's indiscriminate "Westlaw" legal research entries relate to this litigation or non-compensable corporate matters. Accordingly, the Court deducts these entries by fifty pecent. *See* Ex. 3 – Adjusted Costs; *Case*, 157 F.3d at 1258 (citing *Mares*, 801 F.2d at 1209). The following Westlaw costs are also non-compensable for the reasons above:

- Pre-filing Westlaw research, 1/23/13–3/19/13

- Amicus brief Westlaw research, 12/21/15–1/7/16

- Post-fees-application Westlaw research, 5/9/18–5/17/18

### III. Conclusion

Accounting for the lodestar deductions and post-lodestar adjustment, the Court awards Plaintiffs $699,725.95 in attorneys' fees and $18,881.41 in costs. The Court also denies Counsel's request for oral argument. The parties have had more than ample opportunity to argue attorneys' fees and costs; Counsel's argument that there were "issues regarding fees and costs [that Counsel] left unaddressed due to page limitations" is not credible given he has shown no regard for page limits or brevity thus far. Doc. 200, at 15. The Motion for Attorneys' Fees and Non-Taxable Costs Under 42 U.S.C. § 1988 (CIV-14-240-R Doc. 187, CIV-14-685-R Doc. 82) is GRANTED as set forth herein.

IT IS SO ORDERED this 15th day of August 2018.

**DAVID L. RUSSELL**
**UNITED STATES DISTRICT JUDGE**